**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
STEPHANIE MURPHEY,                                        :
                                                          :
                                    Plaintiff,            :          Index No.: 22-cv-08011
                                                          :
            -against-                                     :
                                                          :          **COMPLAINT**
BLONDER BUILDERS INC., MITCHELL B. BLONDER,               :
DANYA CEBUS CONSTRUCTION, LLC, SLATE                      :
PROPERTY GROUP, LLC, and STUART R. SIEGEL,                :
                                                          :
                                                          :
                                    Defendants.           :
------------------------------------------------------------------------X

Plaintiff STEPHANIE MURPHEY by her attorneys, Nicotra Law, PLLC, complaining of

Defendants BLONDER BUILDERS INC., MITCHELL BLONDER, DANYA CEBUS

CONSTRUCTION, LLC, SLATE PROPERTY GROUP, LLC, and STUART SIEGAL, alleges as

follows:

## NATURE OF CLAIMS

1.      The Plaintiff, Ms. Murphey, brings this action to seek redress for egregious sex and

race discrimination that she endured while working as a foreperson at a massive construction site

in New York City. Although Ms. Murphey complained immediately and repeatedly about the

discrimination, the Defendants took no corrective action on Ms. Murphey's behalf. Instead, for

nearly a year Defendants ignored Ms. Murphey's plea for help and allowed the harassment to grow

more severe and eventually culminate in a sexual assault. Following the assault, the Defendants

isolated and marginalized Ms. Murphey and eventually terminated her employment.

2.      The Plaintiff brings this action for sex and race discrimination and retaliation

pursuant to Title VII of the Civil Rights Act of 1964, 42 U. S.C. § 2000e et seq. ("Title VII"), the

New York State Human Rights Law, N.Y. Exec. Law § 290 et sea. (the "NYSHRL") and the New

York City Human Rights Law, N.Y.C. Admin. Code § 8-101 (the "NYCHRL").

## PARTIES

3.      Plaintiff Stephanie Murphey ("Ms. Murphey") is an African American female. At

all relevant times, Ms. Murphey resided in Bronx, New York, and was employed by Blonder

Builders Inc.  Ms. Murphey currently resides in Florida.

4.      Defendant Blonder Builders Inc. ("BBI") is a Domestic Business Corporation. At

all relevant times, BBI employed more than fifteen employees. BBI's address for service of

process is 104 A North Clinton Ave., Lindenhurst, NY, 11757.

5.      Defendant Mitchell B. Blonder ("Blonder") was at all relevant times BBI's Chief

Executive Officer, sole owner, and principal.  Mr. Blonder resides in Lindenhurst, NY.

6.      Defendant Danya Cebus Construction, LLC ("Danya Cebus") is a Domestic

Limited Liability Company with more than fifteen employees. Danya Cebus maintains

headquarters at 111 John Street, Suite 220, New York, NY, 10038. It's registered agent for service

of process is VCORP Agent Services, Inc**.**, 25 Robert Pitt Drive, Suite 204, Monsey, NY, 10952.

7.      Defendant Slate Property Group, LLC ("Slate") is Foreign Limited Liability

Company. Slate employs more than fifteen employees and has its headquarters at 38 East 28th

Street, 9th Floor, New York, NY, 10016. It's registered agent for service of process National

Registered Agents, Inc., 38 East 29th Street, 9th Floor, New York, NY, 10016.

8.      Defendant Stuart Siegel ("Siegel") is a white male and residing in Northport, NY.

At all relevant times, Siegel was employed by Danya Cebus as a Project Manager / Superintendent.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's Title VII action and has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U. S.C. § 1367 because these claims closely relate to her Title VII claims and arise from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

10.      Venue is proper in this district pursuant to 28 U. S.C. § 1391, because Defendants maintain headquarters in the Southern District of New York.

11.      Plaintiff has complied fully with the administrative prerequisites of Title VII. Plaintiff filed a charge of discrimination against the Defendants with the New York City Commission of Human Rights which cross-filed with the United States Equal Opportunity Employment Commission (the "EEOC"). On June 28, 2022, Plaintiff received a notice of Right to Sue from the EEOC.

## FACTUAL ALLEGATIONS

### The Project – 1 Flatbush

12.      In April of 2015, Slate purchased 1 Flatbush Avenue, Brooklyn, NY ("1 Flatbush" or "Work Site") with plans to develop a building for commercial and residential use. In 2019, the construction of 1 Flatbush, a 19 floor, 183,000 square foot building, was complete.

13.      Shortly after purchasing the Work Site, Slate contracted with Danya Cebus to act as Construction Manager and General Contractor for the 1 Flatbush.

14.      In November of 2015, Danya Cebus, contracted with BBI to perform construction and carpentry work at 1 Flatbush. Pursuant to the contract, Danya Cebus, as Construction Manager, retained the right to "exercise complete supervision and control over BBI's Work."

15.     In November of 2016, BBI hired Ms. Murphey in an administrative position. In January of 2017, Blonder named Ms. Murphey as BBI's foreperson at 1 Flatbush.

16.     From 2016 to 2019 Blonder's son, Michael Blonder, worked at Slate as a Construction Superintendent.

17.     In April 2017, Danya Cebus hired Stuart Siegel to work as a Superintendent.

18.     Although Danya Cebus hired and employed Siegel, it was Slate that negotiated directly with Siegel and exercised control over the terms and conditions of Siegel's employment at 1 Flatbush.

19.     Slate, Danya Cebus and BBI worked jointly with the common purpose of completing the construction at 1 Flatbush.

20.     Though Slate was the owner and operator of 1 Flatbush, Slate did not institute an anti-discrimination policy for the Work Site and, upon information and belief, failed to require any of its contractors and subcontractors to implement and conduct anti-harassment training.

**Plaintiff's Employment and Defendants' Unlawful Conduct**

21.     In January of 2017 when Ms. Murphey started working at 1 Flatbush, she was the only woman on site.

22.     During the time that Ms. Murphey worked at 1 Flatbush, no sexual harassment training was conducted. Nor did Ms. Murphey receive any documentation concerning sexual harassment.

23.     Upon information and belief, Slate negotiated with Seigel and determined the terms and conditions of Siegel's employment at 1 Flatbush.

24.     In or about April 2017, Danya Cebus hired Siegel to work as a Superintendent at 1 Flatbush.

25.     As foreperson for BBI, Ms. Murphey was required to interact with Siegel multiple times a day to ensure that various projects were going pursuant to plan.

26.     Immediately upon arriving at the Work Site, Siegel began subjecting Ms. Murphey to sexual harassment and racial discrimination.

27.     Upon meeting Ms. Murphey, Siegel introduced himself by saying, "I heard you were hot."

28.     Siegel's subsequent interactions with Ms. Murphey were inappropriate and tainted with sexual innuendo and implications.

29.     Throughout his employment at 1 Flatbush, Siegel made derogatory comments about African Americans in the presence of Ms. Murphey and other employees at the Work Site.

30.     Within the first two weeks after Siegel began working at the Work Site, Ms. Murphey complained to Blonder that Siegel was inappropriate and "creepy."

31.     Blonder, who told Ms. Murphey he had known Siegel "for years," and had worked with him in the past and acknowledged that Siegel's conduct was inappropriate but dismissed it as expected behavior from him.

32.     Blonder also told Murphey that Siegel had sexually harassed women in the past.

33.     Blonder assured Ms. Murphey that he would take care of the situation and told her that he would speak to Carmen Cofrancesco ("Mr. Confrancesco"), who worked for Slate as the Senior Vice President of Construction, about Siegel's conduct.

34.     Blonder also told Ms. Murphey to record Siegel's inappropriate conduct in her BBI Journal. Thereafter, Ms. Murphey contemporaneously recorded Siegel's offensive conduct.

35.     In or about early May 2017, seeing no change in Siegel's conduct, Ms. Murphey spoke directly to Mr. Cofrancesco. She expressed her discomfort with Siegel's conduct and told

Mr. Cofrancesco that the way Siegel spoke to and treated her made her "sick." Mr. Cofrancesco told Ms. Murphey that he would "do something" about Siegel.

36.     Mr. Confrancesco presented himself to Ms. Murphey as someone who had the power and authority to address the situation.

37.     Upon information and belief, Slate, who had negotiated the terms and conditions of Siegel's employment at 1 Flatbush, had the power to have Siegel removed from 1 Flatbush.

38.      Despite Ms. Murphey's complaints to BBI and Slate, Siegel's harassment continued unabated.

39.     On or about May 11, 2017, as Ms. Murphey was descending a set of stairs at 1 Flatbush, Siegel looked her up and down in a sexually suggestive way and told Ms. Murphey that she drove him crazy. Siegel also told Ms. Murphey that he had "always been into" Black women, and that he enjoyed watching pornographic films with "women like you."

40.     On, or about, May 18, 2017, Siegel told Ms. Murphey that he loved her "shape."

41.     On, or about, May 30, 2017, Ms. Murphey, who was then well-known to be several months pregnant, was again approached by Siegel, who told Ms. Murphey that in his opinion, sex during pregnancy was "the best." Siegel also told Ms. Murphey stories about his sex life with his wife when she was pregnant, inquired about whether Ms. Murphey experienced vaginal discharge and what her breasts and nipples were like during her pregnancy. Siegel also suggested that Ms. Murphey should consider selling her breast milk and opined that there was high demand for it.

42.     Siegel made sexually explicit, and vulgar, comments to Ms. Murphey about her pregnancy, and offered to engage in sexual acts with her to aid her pregnancy and bring about labor, in the presence of other workers at 1 Flatbush.

43.     Shortly thereafter, Ms. Murphey again complained to Blonder about the harassment and asked him to do something about it. Blonder told Ms. Murphey that he would discuss the situation with Danya Cebus.

44.     Upon information and belief, Blonder contacted Danya Cebus's lead superintendent, Alberto De Los Santos ("Mr. De Los Santos"), and Danya Cebus' Project Manager, Bogdan Constantin Contu and informed both that Siegel was acting inappropriately towards Ms. Murphey.

45.     Ms. Murphey also approached Mr. De Los Santos directly and told him about Siegel's harassment.

46.     Mr. De Los Santos held himself out as someone who had the authority to act on her behalf and told Ms. Murphey that he would "take care" of the situation.

47.     Danya Cebus, as Siegel's employer, had the authority to discipline and/or terminate Siegel but did not.

48.     Despite her complaints to BBI, Danya Cebus and Slate, Defendants did not initiate an investigation or take any corrective action on Ms. Murphey's behalf.

49.     As a result, Siegel's behavior became increasingly aggressive and domineering.

50.     On or about June 12, 2017, Siegel stared at Ms. Murphey's breasts and told her that they looked "hot." Siegel then directed Ms. Murphey to pull her shirt down to expose her cleavage to increase the likelihood that they would pass an inspection scheduled for later that day. Siegel stated about the inspector, "Let's hope he's not a faggot."

51.     Siegel then left the area but returned to find that Ms. Murphey had not, in fact, pulled her shirt down to expose her cleavage. In response, Siegel lost his temper and yelled at Ms. Murphey: "Come the fuck on, I'm serious!"

52.    On or about June 20, 2017, when Ms. Murphey did not follow his instructions to patch a hole at the Work Site, Siegel exploded at her again calling her a "bitch".

53.    Siegel continued a near-constant pattern of sexually explicit, vile, suggestive, racially demeaning, and discriminatory behavior directed at Ms. Murphey which was often witnessed by others at the Work Site.

54.    On or about July 28, 2017, when Ms. Murphey tried to speak to Siegel about a delivery, Siegel steered the conversation toward her pregnancy and sex yet again, asking if she was having a lot of sex while she was pregnant. Siegel offered his unsolicited advice on the subject, suggesting that she should be, opining that sperm would be good for her cervix.

55.    Mr. Siegel also harassed the woman that Ms. Murphey was training as her maternity leave replacement. Ms. Murphey's maternity replacement was also African American.

56.    Siegel made inappropriate comments to Ms. Murphey's replacement about her body and his sex life. When Ms. Murphey's replacement refused to engage with Siegel, Siegel asked her if she was a lesbian.

57.    On August 15, 2017, Siegel walked past Ms. Murphey and stuck his tongue out at her suggestively.

58.    Throughout this period, Ms. Murphey regularly complained to Blonder about Siegel and even requested to be moved to a different work location so that she did not have to work with Siegel.

59.    Although Blonder purported to acquiesce to this request in August 2017, he only briefly assigned Ms. Murphey to a second site and then required that she continue working simultaneously at 1 Flatbush, where she continued to suffer harassment at the hands of Siegel.

60.     On August 30, 2017, Siegel's outrageous conduct took on new dimension and rose to a new level. At a high-level meeting at the Work Site where various difficulties and challenges were being aired and discussed, Siegel told the attendees—including Ms. Murphey—that the only thing he was angry about was that he couldn't "fuck Stephanie [Murphey]".

61.     After this meeting, Ms. Murphey met with Mr. De Los Santos, who was present when Siegel made this lewd and inappropriate statement. Ms. Murphey explained the difficulty of working in an environment permeated by sexual, racial, and pregnancy-related harassment.

62.     In response, Mr. De Los Santos sent a text message to an unknown number of recipients, apparently foremen or others employed by multiple entities working at 1 Flatbush:

> Foremen, This is of high importance- please read. Without accusing anyone particularly at this point we MUST speak to our respective crewmembers about sexual and other harassment on the job. We must practice prudence when we address other people on the site but more specifically the females. While to some people a word or phrase may seem playful to others it may be very offensive. Nobody should have to feel uncomfortable working in any place or around anybody on this site. Please refrain from direct personal comments. Harassment is a VERY VERY serious issue and can get us in a lot of trouble. There is ZERO tolerance for it here. So please speak with each one of your team members and let's make our next tool box talk and handed in to us. We will address it more in our meeting but we should act on it now.  Thank you.

63.     Mr. De Los Santos also personally spoke to Siegel.

64.     On August 30, 2018, following his conversation with Mr. De Los Santos, Siegel sent Ms. Murphey a text message acknowledging his harassing behavior, saying he would "cut it out" and "My bad."

65.     Siegel did not "cut it out."

66.     The following week, Siegel made more racially derogatory remarks, asking Ms. Murphey, "how are your collard greens?" and "who did you have to fuck to get on this site?"

67.     Siegel's regular and persistent harassing statements and conduct continued up until Ms. Murphey gave birth and took family leave in early November.

68.     While Ms. Murphey was on maternity leave, Siegel sexually harassed Ms. Murphey's replacement who suffered an eye injury and had to wear a temporary eye patch. Upon information and belief, Siegel began to refer to her as a "sexy fucking pirate" and told her that he would "love to check [her] out."

69.     Upon information and belief, Ms. Murphey's replacement spoke with Blonder about Siegel. Blonder told Ms. Murphey's replacement that he would take care of it and asked that she speak only to him about Siegel's conduct.

70.     In December, Ms. Murphey returned from maternity leave, and Siegel immediately began harassing Ms. Murphey once again.

71.     On February 27, 2018, Ms. Murphey was standing in a hallway with two coworkers. Siegel approached them accompanied by two men unknown to Ms. Murphey. As he passed Ms. Murphey, Siegel slapped her buttocks and said, "Out of my way, hot stuff!"

72.     Shocked, horrified, and afraid, Ms. Murphey burst into tears.

73.     Ms. Murphey returned to her office, where Siegel later approached her in the presence of her coworker. Siegel admitted he had touched Ms. Murphey, but claimed he was "just playing" and that it "was an accident." Siegel left when her co-worker ordered him to get out of the office.

74.     Immediately thereafter, Ms. Murphey told Blonder that Siegel had assaulted her.

75.     Upon information and belief, Blonder called Mr. Cofrancesco and told him about the physical assault as well.

76.     Blonder and Ms. Murphey agreed they should call the police; however, despite numerous calls, police refused to respond to the scene.

77.     On February 28, 2018, Siegel resigned from Danya Cebus.

78.     Following the assault, Ms. Murphey was visited—more than ten months after lodging her first complaint—by two women from Danya Cebus. One woman identified herself as being in "quality control" and asked her questions about the incident and Siegel.

79.     After that initial interview, Ms. Murphey was never again contacted by Danya Cebus or Slate about this incident or the harassment she endured for nearly a year at the hands of Siegel.

80.     Ms. Murphey never received an investigative report, a determination, or any information about any investigation into Siegel.

81.     Upon information and belief, none of the Defendants took any steps to address the work environment, institute an anti-harassment policy, train employees, or take any other corrective action in response to Siegel's actions.

82.     Ms. Murphey continued to work at the Work Site for several weeks after the assault, but was treated noticeably different by coworkers, other site workers, and Blonder.

83.     In early March, Ms. Murphey disclosed to Blonder that she was pursuing a legal action to seek redress for the sexual harassment and racial discrimination that she endured.

84.     In March, Ms. Murphey realized that her BBI journal, which was only partially full but included notes about Siegel's conduct, was missing. When she approached Blonder and asked about her journal, he instructed her to start a new journal.

85.     During the third week in March of 2018, New York City was hit by a blizzard and the Work Site closed due to inclement weather. All employees were told that they would be called back to 1 Flatbush when it was safe to resume operations.

86.     In or around a week later, operations resumed. However, Ms. Murphey was not contacted or invited to return to work.

87.     Upon learning that operations resumed, Ms. Murphey reached out to Blonder. Blonder did not answer her calls or return her messages.

88.     Ms. Murphey also reached out to Blonder's wife but was similarly ignored.

89.     Ms. Murphey perceived that the Defendants was "icing her out" her because she was planning to take legal action.

90.     In April 2018, having received no response from Blonder, Ms. Murphey applied for unemployment insurance.

91.     Blonder did not dispute Ms. Murphey's claim for unemployment insurance, nor did he contact Ms. Murphey to offer her a job back.

92.     On July 11, 2018, Ms. Murphey contacted Blonder via text and asked if she could have her job back. Blonder told Ms. Murphey that they would need to "have a talk first" and then texted, "what's happening with the case?"

93.     On July 28, 2018, Ms. Murphey reached out asking again asking if they could meet to discuss her return to work. Blonder did not respond.

94.     Defendants' retaliatory discharge caused Ms. Murphey to suffer immense emotional and financial harm and harm to her career.

95.     Since 2018, Ms. Murphey has been unable to find similar work at a similar level.

96.     While Ms. Murphey continues to suffer the consequences of Defendants' unlawful acts, Siegel, upon information and belief, has suffered no adverse consequences.

97.     According to Siegel's LinkedIn page, Siegel was employed by another company soon after resigning from Danya Cebus and Danya Cebus does not appear in his list of past employers.

### FIRST CAUSE OF ACTION
### (Sex & Race Discrimination Under Title VII against BBI & Danya Cebus & Slate)

98.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "97" above, with the same force and effect as if fully set forth herein.

99.     Title VII, as codified in 42 U.S.C. § 2000e-2, prohibits discrimination against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex (including pregnancy) and race.

100.    Title VII imposes liability on employers for harassment by non-employees.

101.    BBI is liable for the action of Siegel even though BBI did not employ Siegel.

102.    Pursuant to Title VII, where entities have a sufficient degree of control over an entire project in which an individual is working and where the operations between the entities and the individual's employer are interrelated, companies are often treated as joint employers.

103.    BBI, Danya Cebus and Slate jointly employed Ms. Murphey.

104.    Danya Cebus, subcontracted with BBI to perform construction work and explicitly contracted to retain control over BBI's work.

105.    Slate contracted with Danya Cebus to act as Construction Manager.

106.    BBI, Danya Cebus and Slate, in the context of the Work Site, were all working jointly for a common end pursuant to contracts between the parties and at the overall direction and control of Slate and/or Danya Cebus.

107.    Danya Cebus and Slate had control over Defendant Siegel and could have taken appropriate corrective action on Ms. Murphey's behalf to ensure that her work environment was free from discrimination.

108.    Defendants BBI, Danya Cebus and Slate all had knowledge that Siegel was subjecting Ms. Murphey to sexual harassment and derogatory comments based on her race and pregnancy and failed to take prompt and appropriate corrective action.

109.    Thus, defendants BBI, Danya Cebus and Slate discriminated against the Plaintiff by subjecting her hostile work environment based on her sex and race.

110.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial emotional harm and injury to her career.

111.    Accordingly, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Retaliation Under Title VII against BBI, Danya Cebus and Slate)

112.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "111" above, with the same force and effect as if fully set forth herein.

113.    Between May 2017 and February 2018, Ms. Murphey complained repeatedly to BBI, Danya Cebus and Slate that she was being harassed and discriminated against by Siegel based on her sex and race.

114.    On February 27, 2018, Siegel sexually assaulted Ms. Murphey.

115.    Following the assault and Ms. Murphey's final complaint about Siegel, Defendants retaliated against Ms. Murphey.

116.    In March of 2018, 1 Flatbush was closed due to inclement weather and all workers were told that they would be contacted when it was safe to resume operations.

117.    Though the Work Site reopened, the Defendants did not invite Ms. Murphey to return.

118.    Upon learning that work had resumed, Ms. Murphey reached out to Blonder, but Blonder did not respond. As a result, in April of 2018, Ms. Murphey filed for unemployment insurance. Blonder did not dispute Ms. Murphey's claim.

119.    In July of 2018, Ms. Murphey contacted Blonder and again asked for her job back.

120.    Blonder responded by asking her about the status of her case. Blonder did not offer Ms. Murphey re-employment.

121.    As a result of Defendants' retaliatory discharge, Ms. Murphey has suffered immense financial and emotional harm and injury to her career.

122.    Accordingly, Plaintiff is entitled to economic, compensatory, and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
#### (Sex & Race Discrimination Under the New York State Human Rights Law against all Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "122" above, with the same force and effect as if fully set forth herein.

124.    The New York State Human Rights Law ("NYSHRL"), Section §296, prohibits an employer from engaging in unlawful discriminatory employment practices on the basis of sex (including pregnancy) and race.

125.    Defendants BBI, Danya Cebus and Slate, jointly employed Ms. Murphey, and violated the NYSHRL by failing to take corrective action on her behalf following her complaints of sex and race discrimination.

126.     Pursuant to the NYSHRL, an individual who owns a portion of the employer-entity, or who possesses authority to affect personnel decisions, may be held individually liable for acts of discrimination.

127.     Defendant Blonder, in his individual capacity, violated the NYSHRL by failing to provide Ms. Murphey with an environment free from sex and race-based discrimination.

128.     NYSHRL §296(d) extends the protection of the laws to non-employees stating, "[i]t shall be an unlawful discriminatory practice for an employer to permit unlawful discrimination against non-employees in its workplace."

129.     Section 296(d) further states, "An employer may be held liable to a non-employee who is a contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace or who is an employee of such contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace, with respect to an unlawful discriminatory practice, when the employer, its agents or supervisors knew or should have known that such non-employee was subjected to an unlawful discriminatory practice in the employer's workplace, and the employer failed to take immediate and appropriate corrective action."

130.     Danya Cebus and Slate knew about Siegel's discriminatory conduct and had an obligation to Ms. Murphey, as an employee of a subcontractor and/or an individual providing services pursuant to a contract but failed to take any action to stop the discrimination.

131.     Danya Cebus and Slate violated NYSHRL §296(d) by failing to take prompt corrective action after learning that Siegel was discriminating against Ms. Murphey.

132.     NYSHRL § 296(6) also forbids "any person to aid, abet, incite, compel, or coerce" the commission of an unlawful discriminatory employment practice.

133.     An individual who participates in the conduct giving rise to the discrimination claim can be found liable of aiding and abetting the discrimination.

134.     Defendant Siegel sexually harassed Ms. Murphey and discriminated against Ms. Murphey because of her race and therefore aided and abetted the commission of an unlawful discriminatory employment practice.

135.     Defendant Siegel has violated NYSHRL § 296(6).

136.     The term "person" in NYSHRL § 296(6) includes partnerships, associations, corporations.

137.     In New York State, corporate non-employers can be held liable for aiding and abetting discrimination.

138.     Pursuant to the NYSHRL, a failure to investigate a complaint of discrimination can constitute "active participation" to support an "aiding and abetting" claim.

139.     Danya Cebus and Slate aided and abetted the commission of an unlawful discriminatory practice, in violation of NYSHRL §296(6), by failing to take prompt corrective action on Ms. Murphey's behalf upon learning of Siegel discriminatory conduct.

140.     Accordingly, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**(Retaliation Under the New York State Human Rights Law**
**against BBI, Blonder, Danya Cebus and Slate)**

141.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "140" above, with the same force and effect as if fully set forth herein.

142.    Between May 2017 and February 2018, Ms. Murphey complained to BBI, Danya Cebus and Slate that she was being discriminated against by Siegel based on her sex, pregnancy, and race.

143.    In early March of 2018, Ms. Murphey told Blonder that she was taking legal action to redress the discrimination she suffered.

144.    In late March, 1 Flatbush was closed due to inclement weather and all workers were told that they would be contacted when it was safe to resume operations.

145.    Though the Work Site reopened, the Defendants did not invite Ms. Murphey to return.

146.    In April of 2018, Ms. Murphey filed for unemployment insurance. BBI did not dispute Ms. Murphey's claim.

147.    In July of 2018, Ms. Murphey contacted Blonder and again asked for her job back.

148.    Blonder responded by asking her about the status of her case. Blonder did not offer Ms. Murphey re-employment.

149.    Defendants' retaliation against Plaintiff violates Plaintiff's protected rights under the New York State Human Rights Law.

150.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered immense economic and emotional harm and injury to her career.

151.    Accordingly, Plaintiff is entitled to economic, compensatory, and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**(Discrimination Under the New York City Human Rights Law**
**against all Defendants)**

152.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "151" above, with the same force and effect as if fully set forth herein.

153.    Pursuant to NY Admin. Code §8-130, the New York City Human Rights Law ("NYCHRL") "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed."

154.    Under the NYCHRL, it is an unlawful discriminatory practice to discriminate against an employee in the terms, conditions, or privileges of employment because of the employee's sex (including pregnancy) and race. NYC Admin. Code § 8-107(1)(a).

155.    Ms. Murphey was subjected to a hostile work environment based on her sex and race while working at 1 Flatbush.

156.    To state a claim for hostile work environment under the NYCHRL, a Plaintiff must allege she "has been treated less well than other employees because of" her membership in a protected class.

157.    Ms. Murphey was subjected to the offensive conduct of Siegel based on her sex, pregnancy, and race and as a result was treated less well because of her membership in protected classes.

158.    Defendants BBI, Blonder, in his individual capacity, Danya Cebus, and Slate violated the NYSHRL by failing to take corrective action on her behalf following her complaints of sex and race-based discrimination.

19

159.    The NYCHRL obligates employers to protect non-employees, if they are 'natural persons' who 'carry out work in furtherance of an employer's business enterprise.'

160.    Danya Cebus and Slate were obligated to provide Ms. Murphey—an individual working to carry out work in furtherance of Worksite—an environment free from discrimination.

161.    Danya Cebus and Slate violated the NYCHRL by not taking prompt corrective action upon learning of Siegel's discriminatory conduct.

162.    It is also an unlawful discriminatory practice under the NYCHRL for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [by the statute] or to attempt to do so. NYC Admin Code § 8-107(6).

163.    Pursuant to the NYCHRL, Defendant Siegel is liable for aiding and abetting discrimination sine he engaged in the discriminatory conduct giving rise to Ms. Murphey's claims.

164.    Pursuant to NYCHRL's law prohibiting the aiding and abetting of discrimination, "Person" includes "one or more natural persons, proprietorships, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations…" NYC Admin Code § 8-102.

165.    Defendants Danya Cebus and Slate are liable for aiding and abetting discrimination based on their failure to take prompt remedial action in response to Ms. Murphey's complaints of discrimination.

166.    Defendants' conduct was intentional, malicious and/or otherwise in reckless disregard of Plaintiff's protected rights in violation of the New York City Human Rights Laws, N.Y.C. Admin. Code Section 8-107.

167.    As a result of Defendants' intentional discrimination, Plaintiff has suffered emotional harm and injury to her career.

168.    Accordingly, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**(Retaliation Under the New York City Human Rights Law**
**against BBI, Blonder, Danya Cebus and Slate)**

169.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "168" above, with the same force and effect as if fully set forth herein.

170.    Pursuant to NYC Admin Code § 8-107 (7), it shall be an "unlawful discriminatory practice to retaliate or discriminate in any manner against any person because such person opposed any practice forbidden under this chapter, filed a complaint, or commenced an action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter."

171.    To establish a claim of retaliation under §8-107, a Plaintiff need only show that the retaliatory conduct would "likely deter a person from engaging in protected activity."

172.    At all relevant times Ms. Murphey objected to Siegel's conduct and repeatedly complained to Defendants about Siegel's discriminatory conduct.

173.    Instead of acting on Ms. Murphey's behalf, Defendants retaliated against Plaintiff because of her protected complaints of discrimination in violation of N.Y.C. Admin. Code Sections 8-107(7).

174.    Following her complaints of discrimination and notice that she intended to commence an action based on discrimination, Defendants did not invite Ms. Murphey back to the Work Site following a closure due to inclement weather.

175.    In response to Ms. Murphey's request for her job back in July of 2018, Blonder asked Ms. Murphey about the status of her case. When Ms. Murphey again reached out to enquire into a position, Blonder refused to respond.

21

176. Defendants' conduct was intentional, malicious, and otherwise in reckless disregard of Plaintiff's protected rights in violation of the New York City Human Rights Laws, N.Y.C. Admin. Code Sections 8-107(7).

177. As a result of Defendants' intentional and discrimination, Plaintiff has suffered immense economic and emotional harm and injury to her career.

178. Accordingly, Plaintiff is entitled to economic, compensatory, and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

**DEMAND FOR TRIAL BY JURY**

179. Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Court enter judgment against Defendants awarding Plaintiff:

A. On the FIRST CAUSE OF ACTION, Plaintiff is entitled to compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages;

B. On the SECOND CAUSE OF ACTION, Plaintiff is entitled to economic and compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages;

C. On the THIRD CAUSE OF ACTION, Plaintiff is entitled to compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages;

D.  On the FOURTH CAUSE OF ACTION, Plaintiff is entitled to economic and compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages;

E.  On the FIFTH CAUSE OF ACTION, Plaintiff is entitled to compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages;

F.  On the SIXTH CAUSE OF ACTION, Plaintiff is entitled to economic and compensatory damages plus interest in an amount to be determined at trial, in addition to reasonable costs, attorneys' fees and punitive damages; and

G.  Such other and future relief that this Honorable Court deems just and proper.

Dated:  New York, New York
        September 20, 2022

                                        Nicotra Law, PLLC:

                                        _____
                                        Rachel Nicotra, Esq.
                                        1115 Broadway, 12th Floor
                                        New York, NY 10010
                                        (646) 462-3960
                                        *Attorneys for Plaintiff*